**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

EIGHT DEER VENTURES, LLC,

Plaintiff,

v.

AT&T MOBILITY LLC,

Defendant.

No.   2:26-cv-00573

PATENT CASE

JURY TRIAL DEMANDED

**COMPLAINT FOR PATENT INFRINGEMENT**

1.     Plaintiff Eight Deer Ventures, LLC brings this complaint for patent infringement against Defendant AT&T Mobility LLC and alleges as follows.

**THE PARTIES**

2.     Plaintiff Eight Deer Ventures, LLC ("EDV") is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 99 Hudson Street, 5th Floor, New York, New York 10013.

3.     On information and belief, Defendant AT&T Mobility LLC ("AT&T") is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 1025 Lenox Park Boulevard NE, Atlanta, Georgia 30319. AT&T may be served through its registered agents, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 and CT Corporation System, 1999 Bryan Street Suite 900, Dallas, Texas 75201.

**JURISDICTION AND VENUE**

4.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

1

5.      This Court has personal jurisdiction over AT&T because it has committed acts within Texas and this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

6.      On information and belief, AT&T conducts substantial business in this forum, including (a) engaging in the infringing conduct alleged herein in Texas and in this District; (b) regularly and consistently doing and soliciting business in Texas and in this District; (c) engaging in other persistent courses of conduct in Texas and in this District, such as providing customer service and repairs in connection with its business operations; (d) deriving substantial revenue from offering infringing products and services and providing infringing goods to consumers in Texas and in this District; and (e) purposefully establishing such substantial, systematic, and continuous contacts with the state of Texas and with this District such that it can reasonably expect to be subject to suit in this District.

7.      On information and belief, AT&T maintains regular and established places of business in this District, including by (a) maintaining or controlling retail stores in this District, (b) maintaining and operating infringing systems in this District, and (c) maintaining and operating other places of business in this district, including those where research, development, or sales are conducted, where customer service is provided, and/or where repairs are made. For example:

a.      AT&T's website displays information for retail stores located at 4757 South Broadway Avenue, Tyler, Texas 75703; 2028 E. Southeast Loop #323, Tyler, Texas 75701; and 8922 South Broadway Avenue Ste. 112, Tyler, Texas 75703 (among others).

b.      AT&T also has what it refers to as the AT&T Foundry in Plano, Texas, which AT&T uses to design, test, and sell telecommunications services, including services that infringe EDV's patents.

8.      In other recent patent infringement actions, AT&T has either admitted or has not contested this Court's personal jurisdiction over it. *See, e.g.*, AT&T Answer, *Pegasus Wireless Innovation v. Verizon Commc'ns Inc. et al.*, No. 2:23-cv-00640-JRG, Dkt. 39 ¶¶ 16, 18 (E.D. Tex. Mar. 25, 2024).

9.      Venue in the Eastern District of Texas is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b), including because AT&T is deemed to reside in this District; because a substantial part of the events or omissions giving rise to the claims occurred in this District, including acts of infringement by AT&T; and because AT&T has a regular and established place of business in this District.

10.      In other recent patent infringement actions, AT&T has either admitted or has not contested that this District is a proper venue. *See, e.g.*, AT&T Answer, *Pegasus Wireless Innovation v. Verizon Commc'ns Inc. et al.*, No. 2:23-cv-00640-JRG, Dkt. 39 ¶ 19 (E.D. Tex. Mar. 25, 2024).

## THE PATENTS-IN-SUIT

11.      EDV is the assignee of U.S. Patent No. 9,661,597  (the "'597 Patent," attached as Exhibit A), U.S. Patent No. 9,729,355 (the "'355 Patent," attached as Exhibit B), and U.S. Patent No. 10,715,628 (the "'628 Patent," attached as Exhibit C) (collectively, the "Patents-in-Suit"). The Patents-in-Suit cover groundbreaking innovations in telecommunications networks—including novel methods for remote device deregistration, remote device upgrades, and other remote device management.

12.   ***'597 Patent.*** The '597 Patent discloses a method for remotely deregistering a terminal peripheral (such as a cellphone). Among other things, the '597 Patent recites using a gateway to send a request for deregistration of a terminal peripheral from a machine-to-machine/man ("M2M") service platform or application to the terminal peripheral. The '597 Patent also recites deleting the registration information of the terminal peripheral that is stored by the gateway. AT&T infringes the '597 Patent with systems and devices that remotely trigger the deregistration of a device—resulting in the removal of the device from the network. For example, as described below, AT&T's "Control Center" allows customers to log in to a website and deregister a device in the specific manner recited in the '597 Patent.

13.   ***'355 Patent.*** The '355 Patent discloses a method for remotely managing a terminal peripheral (such as remotely triggering updates to a device's firmware). Among other things, the '355 Patent recites sending a remote management operation from a M2M service platform or application via a M2M gateway; the M2M gateway forwarding the remote management operation to a terminal peripheral; the terminal peripheral reporting execution information about the remote management operation (such as "success" or "failure," along with the reason for any failure) back to the M2M service platform or application via the M2M gateway; and the M2M gateway processing that execution information by either removing the remote management operation from the terminal peripheral (if successful) or resending the remote management operation at a preset time (if unsuccessful). AT&T infringes the '355 Patent with systems and devices that remotely trigger firmware upgrades. For example,  as described below, AT&T's "Wireless Internet Manager" allows customers to perform remote upgrades in the specific manner recited in the '355 Patent.

14.     ***'628 Patent.*** The '628 Patent discloses an attribute operating method, including: receiving a structured request to operate on a resource's attribute; determining the requested operation; executing the requested operation on the attribute; and reporting a result. Before the '628 Patent, traditional telecommunications provisioning did not permit modifying an attribute (such as adding a new phone line for an existing account) without deleting and reconstructing the entire attribute. The '628 Patent solved this technological problem by permitting modifications to an existing attribute (without having to reconstruct the entire attribute). AT&T infringes the '628 Patent with systems and devices that allow an administrator to perform remote operations on device attributes without having to reconstruct those attributes from scratch. For example, as described below, AT&T's "Office@Hand Platform" allows customers to perform remote operations on device attributes in the specific manner recited in the '628 Patent.

### THE '597 PATENT

15.     AT&T infringes the '597 Patent with systems and devices that remotely deregister devices in the specific manner recited in the '597 Patent.

16.     For example, accountholders can remotely deregister a device using the "Deactivation Request" feature in AT&T's Control Center:[1]

> **1.    AT&T Control Center**
>
> **1.1    Eligibility.**    Pursuant to the terms and conditions of the Agreement and this Attachment, AT&T provides Customer the ability to conduct ACC Management through the Portal, and receive the ACC Invoice. Customer must be in compliance with the Agreement to be eligible for ACC.  ACC is only available to Customer and its CRUs.  ACC is not available to IRUs.
>
> **2.    Portal.**    AT&T will provide Customer with the Portal to, among other things, order ACC Plans and SIMs, and conduct Activations and Deactivations.  Customer may use the Portal in accordance with and subject to the terms and conditions of the Agreement and this Attachment. Customer must supply all its own computer equipment, peripherals, Internet service, software and related means at its sole cost and expense. AT&T may reasonably rely on the authority and capacity of any person who executes an order on Customer's behalf and, accordingly, AT&T may rely on the information provided through the Portal. AT&T has no liability to Customer for Customer's inability to access the Portal for reasons beyond AT&T's control.

---

[1] https://www.business.att.com/content/dam/businesscenter/pdf/legal/att-control-center-111016.pdf (last visited July 10, 2026).



17.     Using AT&T's Control Center, AT&T accountholders can select and deactivate a particular device, as shown below:[2]



18.     Once the device's SIM Card is deactivated, the device cannot be managed in AT&T Control Center again until it is reactivated:[3]

---

[2] https://developer.cisco.com/docs/GMM/manage-sims-with-control-center/#deactivate-a-sim-card-when-deleting-a-gateway (last visited July 10, 2026). Cisco's IoT platform (the "Gateway Management Module" or "GMM") underpins AT&T's Control Center.

[3] https://developer.cisco.com/docs/GMM/manage-sims-with-control-center/#deactivate-or-activate-a-gateway-sim-card (last visited July 10, 2026).

# Deactivate or Activate a Gateway SIM card

If a SIM card is managed by the Control Center, you can either deactivate, or activate, it from the Networking menu.

1. Select **Gateway > Gateways** and select the **Monitor** tab.

2. Select a gateway checkbox.

3. Click the **Networking tab __> Cisco Control Center**.

4. The SIM card status is displayed. Click **Activate** or **Deactivate**.

   > **Note:** Deactivating a SIM card ends network connectivity on that card and the gateway cannot be managed in GMM. To resume gateway management, reactivate the SIM card.

5. (Optional) Click **Cisco Control Center** to launch Control Center UI.

19.    Technical documentation for using AT&T's Control Center confirms that deactivating the SIM Card in this manner results in the device "becom[ing] offline":[4]

**What should I keep in mind before canceling the AT&T plan on the eSIM?**

You can deactivate the eSIM on the Meraki dashboard. Doing so will only deactivate the eSIM on the MG52/E and not the AT&T plan active on the device. You can reactivate the eSIM and regain connectivity back even if the MG52/E reports offline on the dashboard.

Deactivating the plan on the AT&T fastactivation portal will result in the rate plan getting deactivated. The device will become offline on dashboard. You will have to reinstate the rate plan back on the fastactivation portal. Once you reactivate the plan, you may have to reboot the device or wait until the device connects back to dashboard. The MG52/E has retry mechanisms to regain connectivity on the dashboard once the rate plan is activated.

The important thing to keep in mind is to have a secondary SIM on the physical slot if you wish to deactivate the AT&T rate plan via fastactivation portal to maintain cellular connectivity.

20.    AT&T accountholders can similarly deactivate a device's SIM Card in the process of deleting the device from the AT&T Control Center:[5]

---

[4] https://documentation.meraki.com/SASE_and_SD-WAN/Cellular/Install_and_Get_Started/eSIM_Activation/Cisco_MG52%2F%2FE_ATT_eSIM_Activation_FAQ (last visited July 10, 2026).

[5] https://developer.cisco.com/docs/GMM/manage-sims-with-control-center/#deactivate-or-activate-a-gateway-sim-card (last visited July 10, 2026).

# Deactivate a SIM card when deleting a gateway

When you delete a gateway, you can also deactivate the SIM card if it is managed by Control Center.

1. Go to **Gateway > Gateways**

2. Click the **Monitor** tab and select a gateway checkbox.

3. Click **Delete** (in the upper right).

4. Select the **Deactivate SIM card**.

   **Important:** The SIM card can be reactivated after the gateway delete operation in Control Center only.

5. Click **Delete**.

21.    AT&T accountholders can also remotely cause a device to deregister by sending a "Cancel Location" command to the device. The "Cancel Location" command forces the device "to reregister on the network":[6]



## Key Features

- Get quick insights to device signaling events up to 30 days in the past

- Troubleshoot device connectivity

- Send SMS to device

- Cancel Location causing the device to reregister on the network

- Packet of Disconnect (soft reset) only disconnecting the ongoing data session. Device remains registered on the network

22.    In short, AT&T's Control Center performs all the steps required by the '597 Patent—including by sending a command to deregister a device, providing notifications about the status of the deregistration, and removing the device from the network upon deregistration.

---

[6] https://www.ciscolive.com/c/dam/r/ciscolive/emea/docs/2024/pdf/BRKSPG-1002.pdf (last visited July 10, 2026).

**THE '355 PATENT**

23.    AT&T infringes the '355 Patent with systems and devices that remotely trigger device upgrades in the specific manner recited in the '355 Patent.

24.    For example, AT&T offers "Enterprise Firmware Over-the-Air" capabilities with Samsung devices that permit IT administrators to deploy firmware upgrades across multiple connected devices:[7]



25.    AT&T's "Enterprise Firmware Over-the-Air" capabilities provide notifications to IT administrators about the success or failure of the firmware upgrades, as recited in the '355 Patent:[8]



---

[7] https://www.business.att.com/content/dam/businesscenter/pdf/legal/att-enterprise-efota-brochure.pdf (last visited July 10, 2026).

[8] https://www.business.att.com/content/dam/businesscenter/pdf/legal/att-enterprise-efota-brochure.pdf (last visited July 10, 2026).

26.     AT&T's "Enterprise Firmware Over-the-Air" capabilities also allow customers to schedule upgrades to occur at particular intervals—allowing the system to reattempt the upgrade if it was at first unsuccessful:[9]



27.     Similarly, using the AT&T "Home Base" Wireless Internet Manager, customers can login to a remote website and trigger firmware upgrades in a manner that infringes the '355 Patent:[10]

28.     After logging into the "Home Base" Wireless Internet Manager, an accountholder can check for applicable firmware upgrades, as shown below:[11]

---

[9] https://www.business.att.com/content/dam/businesscenter/pdf/legal/att-enterprise-efota-brochure.pdf (last visited July 10, 2026).
[10] https://www.att.com/device-support/article/148004/att/mf279/?os=Other/ last visited July 10, 2026).
[11] https://www.att.com/device-support/article/148004/att/mf279/?os=Other/ last visited July 10, 2026).



29.    Devices connected to the "Home Base" Wireless Internet Manager communicate identifying information to AT&T's servers, such as the applicable firmware version:[12]



30.    Once an upgrade has successfully been installed, AT&T's "Home Base" Wireless Internet Manager displays the version of the new firmware that has been installed.

---

[12] https://www.att.com/device-support/article/148004/att/mf279/?os=Other/ last visited July 10, 2026).

31.    Similarly, AT&T's "Internet Air for Business 5G Gateway" Wireless Internet Manager allows customers to install firmware upgrades in a manner that infringes the '355 Patent:[13]



32.    An example of a gateway for AT&T's "Internet Air for Business" is shown below:[14]



---

[13] https://www.att.com/scmsassets/support/wireless/att-internet-air-en-ug-v5.pdf (last visited July 10, 2026).
[14] https://www.att.com/scmsassets/support/wireless/att-internet-air-en-ug-v5.pdf (last visited July 10, 2026).

33.     After logging into the dashboard for the "Internet Air for Business 5G Gateway" Wireless Internet Manager, an accountholder can check for applicable firmware upgrades, as shown below:[15]

**Check for firmware updates**

1. From the Dashboard ⊞ , click **System Settings** ⚙ then click **Firmware Update**.

2. Click **Check for update** ( Check for update ) to generate a result status.

   a. When the firmware is up to date the status will read, **"The current firmware is the latest version."**

   b. When the firmware needs to be updated the status will read, "**New version is found**".

3. Select "**Download and Update**" A progress bar will appear and the System LED Light will flash blue during the installation process.

4. Your gateway will power cycle upon successful completion.

34.     Devices connected to the "Internet Air for Business 5G Gateway" Wireless Internet Manager communicate identifying information to AT&T servers, such as the applicable version of firmware:[16]

**Firmware Information**

| Information | Description |
|---|---|
| **Product ID** | View your product ID. |
| **Hardware Version** | View your hardware version. |
| **SVN** | View your IMEI software version. |
| **Firmware version installed** | View the firmware version that is currently installed on your gateway. |

---

[15] https://www.att.com/scmsassets/support/wireless/att-internet-air-en-ug-v5.pdf (last visited July 10, 2026).
[16] https://www.att.com/scmsassets/support/wireless/att-internet-air-en-ug-v5.pdf (last visited July 10, 2026).

35.    AT&T's "Internet Air for Business 5G Gateway" Wireless Internet Manager communicates information about the status of the upgrade to the accountholder, as shown below:[17]

3. Select "**Download and Update**" A progress bar will appear and the System LED Light will flash blue during the installation process.

36.    Once an upgrade has been successfully installed, AT&T's "Internet Air for Business 5G Gateway" Wireless Internet Manager displays the new version of the firmware that has been installed.

37.    Similarly, AT&T allows customers to push firmware upgrades to AT&T-branded phones, such as the AT&T Amigo Jr. Phone:[18]

From the Settings screen, scroll to and select **Software update**, then select **Download and install**.

Note: If an update is available, follow the on-screen instructions to perform the update. If an update is not available, select the **back arrow**.



---

[17] https://www.att.com/scmsassets/support/wireless/att-internet-air-en-ug-v5.pdf (last visited July 10, 2026).
[18] https://www.att.com/device-support/index/att/amigo-jr/?os=Other (last visited July 10, 2026).

14

38.    In short, AT&T's Wireless Internet Manager capabilities allow IT administrators and other AT&T customers to push firmware upgrade updates to connected devices in the manner recited in the '355 Patent.

### THE '628 PATENT

39.    AT&T infringes the '628 Patent with systems and devices that operate on device attributes in the specific manner recited in the '628 Patent.

40.    For example, AT&T's Office@Hand Platform is AT&T's "Unified Communications as a Service" (or "UCaaS") platform. AT&T's Office@Hand Platform operates on device attributes in a manner that infringes the '628 Patent.

41.    AT&T's Office@Hand Platform is a cloud-based communication platform deployed across secure data center infrastructure:[19]

## Physical and environmental security

The AT&T Office@Hand platform is deployed across SSAE 18 and ISO 27001-audited data centers, protected by robust electronic prevention systems, on-site engineering specialists, and security guards. The geographic diversity of our locations also minimizes the risk of data loss and service interruption due to catastrophe.

42.    As a cloud-based platform, the Office@Hand Platform's servers rely on high-performance processors and utilize memory resources to store application code and user data.

43.    AT&T's Office@Hand Platform accepts requests from various "sending ends," such as receiving a request from an administrator to add a new user:[20]

---

[19] https://asecare.att.com/tutorials/data-security-att-officehand-44882/?product=AT&T%20Office@Hand (last visited July 10, 2026).

[20] https://marketo.ringcentral.com/rs/ringcentral/images/ct-2611_att_guide_startup_admin_3.0.pdf (last visited July 10, 2026).

## User Settings

### Adding Users

You'll want to add new users to your Office@Hand account as your business grows. As an administrator, you may also need to edit existing user phone settings or set up new users.

**NOTE:** Extensions 0 and 9 are reserved for the operator and company directory, respectively. The number of user extensions you can create depends on your plan.

### Adding a User/Extension

1. From **Settings > Phone System**, click **Users**.
2. Click the **Add** button.
3. You may be asked to select the **type of user**: Premium or Virtual. Pick one* and click **Next**.
4. Fill out information for the new user.
5. Click **Save** when done.

44.    The parameters in these requests include the type of operation (such as adding a new user), the resource being operated on (such as the account to which a new user is being added), the type of information being added (such as a user extension for a new user), and the content of the information being added (such as the new user's name and contact information). For example, AT&T's Office@Hand Platform accepts HTTP requests that indicate the type of operation being performed and the resource being operated on:[21]

## Methods

As with many other REST APIs, the RingCentral API's resources are accessible by standard HTTP methods: GET, POST, PUT (or PATCH), and DELETE. These methods form a uniform CRUD interface expanded as "create, retrieve, update and delete".

45.    AT&T's Office@Hand Platform distinguishes between performing operations on entire resources (like adding or deleting a user) and performing operations on attributes of those

---

[21] https://developers.ringcentral.com/guide/basics (last visited July 10, 2026).

16

resources (like deleting a particular phone number for a user). For example, AT&T's Office@Hand Platform requires a minimum set of attributes for users:[22]



**Schema Discovery**

The following list is the minimum set of attributes needed from Okta into RingCentral Office @Hand for AT&T:

| OKTA | TO > RingCentral Office @Hand for AT&T |
|---|---|
| user.firstName | firstName |
| user.lastName | lastName |
| user.email | email |
| user.mobilePhone | mobilePhone |
| user.streetAddress | street |
| user.city | city |
| user.state | state |
| Note: Make sure State in AD/Okta is in proper ISO forma... | |
| user.zipCode | zip |
| user.countryCode | country |
| user.department | department |

46.    AT&T's Office@Hand Platform examines incoming requests to decide which action to perform on which data. For example, when a "DELETE" request is received, AT&T's Office@Hand Platform responds by deleting the attribute that is the object of the request:[23]

**DELETE**    Removes the object represented by the resource identified by the request URI.

47.    Similarly, AT&T's Office@Hand Platform classifies adding an extension number as adding an attribute:[24]

## Bi-directional Sync (Attribute Level Mastering)

While either Okta or Active Directory are the sources of truth for most attributes in a user profile, in the case of a RingCentral Office @Hand for AT&T deployment, the **Direct Number** and **Extension** information comes from RingCentral Office @Hand for AT&T. To support this, you need to setup bi-directional sync for these attributes so that values can flow back to Okta or Active Directory.

To achieve this, do the following:

1  Contact Okta Support to enable the **ALLOW_BOTH_PROFILE_MASTERING_AND_PUSH** feature flag.

2  Add the **Direct Number** and **Extension Number** attributes via Schema Discovery to the AppUser profile by navigating to **Profile Editor > RingCentral Office @Hand for AT&T > Add Attributes**

---

[22] https://saml-doc.okta.com/provisioning_docs/ringcentral-office-hand-att_provisioning.html#schema (last visited July 10, 2026).

[23] https://developers.ringcentral.com/guide/basics (last visited July 10, 2026).

[24] https://saml-doc.okta.com/provisioning_docs/ringcentral-office-hand-att_provisioning.html (last visited July 10, 2026).

48.     AT&T's Office@Hand Platform also determines whether or not the attribute can be added as a multiple.  For example, the Office@Hand Platform permits multiple phone numbers to be assigned to a single user:[25]



49.     By contrast, AT&T's Office@Hand Platform does not permit a user's extension to be added as a multiple:[26]

## Provisioning Errors

| ERROR MESSAGE | EXPLANATION |
| --- | --- |
| The [${parameterName}] is invalid. Please correct the parameter in Active Directory. | Values coming from Active Directory are not right. Please correct the values. Make sure all the values are right. |
| Resource for parameter [${parameterName}] is not found. | Value is missing in Active Directory. Please correct it. |
| JSON can not be parsed. Please check your data AD and correct it. | JSON can not be parsed. Please check your data AD and correct it. |
| Service Temporarily Unavailable. Please check back later. | Please check back again in sometime. Issues on Okta. |
| Extension already in use. Please go to RingCentral's web portal and see what extensions are available. | Extension already in use. Please check in service web if extension is available or not. |
| user.city | city |
| Extension number is duplicate. Please correct in Active Directory if you have an extension field. Otherwise edit it in the RingCentral Service web portal | To bulk edit extensions in the RingCentral Office @Hand for AT&T web portal. Please go to User Management > edit extensions and follow the instructions to edit. |
| More than one record found for Email: [email] | RingCentral Office @Hand for AT&T has more than one user record for the given [email]. Since Okta uses email address as the unique identifier per user, you need to ensure that does not have duplicate users with the same email address. |
| user.countryCode | country |
| user.department | department |

---

[25] https://asecare.att.com/wp-content/uploads/2019/02/ATT-Office@Hand-User-Guide-10.3.pdf (last visited July 10, 2026).

[26] https://saml-doc.okta.com/provisioning_docs/ringcentral-office-hand-att_provisioning.html (last visited July 10, 2026).

50.    AT&T's Office@Hand Platform notifies the accountholder when these constraints prevent performing the requested operation on the attribute. For example, when an accountholder attempts to assign an extension number of "911," AT&T's Office@Hand Platform informs the accountholder that the extension is "reserved for special functions":[27]

51.    Similarly, the Office@Hand Platform reserves certain extensions for other special functions, such as an operator or company directory:[28]

52.    Once successfully processed, AT&T's Office@Hand Platform carries out the requested operation on the attribute. For example, AT&T's Office@Hand Guide confirms that administrators can successfully add users, limited only by their plan's user count capacity:

---

[27] https://asecare.att.com/tutorials/receiving-an-error-for-an-extension-number-in-att-officehand-18633/?product=AT&T%20Office@Hand (last visited July 10, 2026).
[28] https://marketo.ringcentral.com/rs/ringcentral/images/ct-2611_att_guide_startup_admin_3.0.pdf (last visited July 10, 2026).

19

**User Settings**

**Adding Users**

You'll want to add new users to your Office@Hand account as your business grows. As an administrator, you may also need to edit existing user phone settings or set up new users.

**NOTE:** Extensions 0 and 9 are reserved for the operator and company directory, respectively. The number of user extensions you can create depends on your plan.

Adding a User/Extension

1. From **Settings > Phone System**, click **Users**.
2. Click the **Add** button.
3. You may be asked to select the **type of user**: Premium or Virtual. Pick one* and click **Next**.
4. Fill out information for the new user.
5. Click **Save** when done.

53.    Conversely, when an administrator deletes an extension, the extension is removed from the account, as shown with the "No Content" response below:[29]

```
Request

DELETE /restapi/v1.0/account/~/extension/404721119008?save
```

```
Response

HTTP/1.1 204 No Content
```

54.    In short, AT&T's Office@Hand Platform infringes the '628 Patent, including with its method for operating device attributes such as user extensions and other user settings.

**COUNT I: INFRINGEMENT OF '597 PATENT**

55.    EDV repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

---

[29] https://developers.ringcentral.com/api-reference/User-Settings/deleteExtension (last visited July 10, 2026).

56. On May 23, 2017, the United States Patent and Trademark Office duly and legally issued the '597 Patent, entitled "Method and Device for Deregistering a Terminal Peripheral."

57. EDV owns all right, title, and interest in and to the '597 Patent, including the right to assert all causes of action under the '597 Patent and the right to any remedies for the infringement of the '597 Patent.

58. AT&T has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claims 1 and 10, of the '597 Patent in violation of 35 U.S.C. § 271(a). For example, AT&T has, without authorization, operated, used, and sold, and continues to operate, use, and sell, access to the AT&T Control Center, which is capable of remotely deregistering a terminal peripheral in the manner described in the claims of the '597 Patent, thereby infringing at least claim 1 of the '597 Patent. AT&T's infringing use of the '597 Patent includes AT&T's internal use and testing of the AT&T Control Center.

59. AT&T's Control Center satisfies all claim limitations of one or more of the claims of the '597 Patent, including at least claims 1 and 10.

60. AT&T has indirectly infringed and continues to indirectly infringe the '597 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agents, subsidiaries, affiliates, partners, service providers, customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the AT&T Control Center and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to such systems with knowledge and the specific intent that its efforts will result in the direct infringement of the '597 Patent.

61.     For example, AT&T took active steps to encourage end users to utilize the AT&T Control Center in a manner it knows will directly infringe each element of at least claim 1 of the '597 Patent, including by instructing end users on how to remotely deregister a device using the AT&T Control Center. The infringing aspects of the AT&T Control Center otherwise have no meaningful use, let alone any meaningful non-infringing use.

62.     AT&T has indirectly infringed and continues to indirectly infringe the '597 Patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the AT&T Control Center, including the infringing remote deregistration features, with knowledge that the AT&T Control Center is especially designed or adapted to operate in a manner that infringes the '597 Patent and despite the fact that the infringing technology or aspects of the products are not a staple of commerce suitable for substantial non-infringing use.

63.     For example, AT&T is aware that the remote deregistration functionality described above and included in the AT&T Control Center infringes the '597 Patent, including at least claim 1. AT&T continues to sell and offer to sell the AT&T Control Center in the United States after receiving notice of the '597 Patent and how the remote deregistration functionality infringes that patent.

64.     AT&T's acts of infringement have caused and continue to cause damages to EDV, and EDV is entitled to recover from AT&T for the damages EDV has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '597 Patent, together with interest and costs as fixed by the Court.

65.     AT&T has had notice of the '597 Patent at least as of the date of this Complaint.

22

## COUNT II: INFRINGEMENT OF '355 PATENT

66.    EDV repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

67.    On August 8, 2017, the United States Patent and Trademark Office duly and legally issued the '355 Patent, entitled "Method, Device, and System for Remote Management of Terminal Peripheral."

68.    EDV owns all right, title, and interest in and to the '355 Patent, including the right to assert all causes of action under the '355 Patent and the right to any remedies for the infringement of the '355 Patent.

69.    AT&T has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claims 1 and 10, of the '355 Patent in violation of 35 U.S.C. § 271(a). For example, AT&T has, without authorization, operated, used, and sold, and continues to operate, use, and sell, access to the AT&T Wireless Internet Manager platforms, which are capable of remotely causing firmware upgrades in the manner described in the claims of the '355 Patent, thereby infringing at least claim 1 of the '355 Patent. AT&T's infringing use of the '355 Patent includes AT&T's internal use and testing of the AT&T Wireless Internet Manager platforms.

70.    AT&T's Wireless Internet Manager platforms satisfy all claim limitations of one or more of the claims of the '355 Patent, including at least claims 1 and 10.

71.    AT&T has indirectly infringed and continues to indirectly infringe the '355 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agents, subsidiaries, affiliates, partners, service providers, customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the AT&T Wireless Internet Manager platforms and the creation

23

and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to such system, with knowledge and the specific intent that its efforts will result in the direct infringement of the '355 Patent.

72. For example, AT&T took active steps to encourage end users to utilize the AT&T Wireless Internet Manager platforms in a manner it knows will directly infringe each element of at least claim 1 of the '355 Patent, including by instructing end users on how to remotely install firmware upgrades using the AT&T Wireless Internet Manager platforms. The infringing aspects of the AT&T Wireless Internet Manager platforms otherwise have no meaningful use, let alone any meaningful non-infringing use.

73. AT&T has indirectly infringed and continues to indirectly infringe the '355 Patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the AT&T Wireless Internet Manager platforms, including the infringing firmware upgrade features, with knowledge that the AT&T Wireless Internet Manager platforms are especially designed or adapted to operate in a manner that infringes the '355 Patent and despite the fact that the infringing technology or aspects of the products are not a staple of commerce suitable for substantial non-infringing use.

74. For example, AT&T is aware that the firmware upgrade functionality described above and included in the AT&T Wireless Internet Manager platforms infringes the '355 Patent, including at least claim 1. AT&T continues to sell and offer to sell the AT&T Wireless Internet Manager platforms in the United States after receiving notice of the '355 Patent and how the firmware upgrade functionality infringes that patent.

75. AT&T's acts of infringement have caused and continue to cause damages to EDV, and EDV is entitled to recover from AT&T for the damages EDV has sustained as a result of those

wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '355 Patent, together with interest and costs as fixed by the Court.

76.     AT&T has had notice of the '355 Patent at least as of the date of this Complaint.

### COUNT III: INFRINGEMENT OF '628 PATENT

77.     EDV repeats and incorporates by reference each preceding paragraph as if fully set forth herein.

78.     On July 14, 2020, the United States Patent and Trademark Office duly and legally issued the '628 Patent, entitled "Attribute Operating Method and Device."

79.     EDV owns all right, title, and interest in and to the '628 Patent, including the right to assert all causes of action under the '628 Patent and the right to any remedies for the infringement of the '628 Patent.

80.     AT&T has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claims 1 and 9, of the '628 Patent in violation of 35 U.S.C. § 271(a). For example, AT&T has, without authorization, operated, used, and sold, and continues to operate, use, and sell, access to the AT&T Office@Hand Platform, which is capable of remotely performing operations on attributes, thereby infringing at least claim 1 of the '628 Patent. AT&T's infringing use of the '628 Patent includes AT&T's internal use and testing of the AT&T Office@Hand Platform.

81.     AT&T's Office@Hand Platform satisfies all claim limitations of one or more of the claims of the '628 Patent, including at least claims 1 and 9.

82.     AT&T has indirectly infringed and continues to indirectly infringe the '628 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agents, subsidiaries, affiliates, partners, service providers,

25

customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the AT&T Office@Hand Platform and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to such systems with knowledge and the specific intent that its efforts will result in the direct infringement of the '628 Patent.

83.    For example, AT&T took active steps to encourage end users to utilize the AT&T Office@Hand Platform in a manner AT&T knows will directly infringe each element of at least claim 1 of the '628 Patent, including by instructing end users on how to perform remote operations on attributes without reconstructing those attributes. The infringing aspects of the AT&T Office@Hand Platform otherwise have no meaningful use, let alone any meaningful non-infringing use.

84.    AT&T has indirectly infringed and continues to indirectly infringe the '628 Patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the AT&T Office@Hand Platform, including the infringing attribute operation features, with knowledge that the AT&T Office@Hand Platform is especially designed or adapted to operate in a manner that infringes the '628 Patent and despite the fact that the infringing technology or aspects of the products are not a staple of commerce suitable for substantial non-infringing use.

85.    For example, AT&T is aware that the attribute operation functionality described above and included in the AT&T Office@Hand Platform infringes the '628 Patent, including at least claim 1. AT&T continues to sell and offer to sell the AT&T Office@Hand Platform in the United States after receiving notice of the '628 Patent and how the attribute operation functionality infringes that patent.

86.     AT&T's acts of infringement have caused and continue to cause damages to EDV, and EDV is entitled to recover from AT&T for the damages EDV has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '628 Patent, together with interest and costs as fixed by the Court.

87.     AT&T has had notice of the '628 Patent at least as of the date of this Complaint.

## DEMAND FOR JURY TRIAL

88.     EDV demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## FEES AND COSTS

89.     To the extent that AT&T's willful and deliberate infringement or litigation conduct supports a finding that this is an "exceptional case," an award of attorneys' fees and costs to EDV is justified pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, EDV prays for relief as follows:

(a)     Declaring that AT&T has infringed the Patents-in-Suit, contributed to the infringement of the Patents-in-Suit, and/or induced the infringement of the Patents-in-Suit;

(b)     Awarding EDV damages arising out of this infringement of the Patents-in-Suit, including enhanced damages pursuant to 35 U.S.C. § 284, and pre-judgment and post-judgment interest, in an amount according to proof;

(c)     Permanently enjoining AT&T and its officers, agents, servants, employees, and those acting in privity with them, from further infringement, including inducing infringement and contributory infringement, of the Patents-in-Suit;

(d)     Awarding attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

27

(e)     Awarding EDV such other costs and further relief as the Court deems just and proper.

Respectfully submitted,                                              July 10, 2026

/s/ Joseph S. Grinstein

Joseph S. Grinstein (Lead Attorney)
  Texas State Bar No. 20213950
  jgrinstein@susmangodfrey.com
Shawn Blackburn
  Texas State Bar No. 24089989
  sblackburn@susmangodfrey.com
Meng Xi
  California State Bar No. 280099
  mxi@susmangodfrey.com
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
Fax: (713) 654-6666

Daniel D. Duhaime
  (*pro hac vice* forthcoming)
  New York State Bar No. 5780432
  dduhaime@susmangodfrey.com
SUSMAN GODFREY LLP
One Manhattan West, 50th Floor
New York, New York 10001
Tel: (212) 336-8330
Fax: (212) 336-8340

Andrea Fair
  Texas State Bar No. 24078488
  andrea@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
Tel: (903) 757-6400
Fax: (903) 757-2323

*Counsel for Plaintiff Eight Deer Ventures, LLC*

28